United States District Court
Southern District of Texas

**ENTERED**

June 05, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JESSICA LATRESE CHATMAN, | § | |
| TDCJ # 02173840 | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-1117 |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Texas state inmate Jessica Latrese Chatman, representing herself, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging her 2017 conviction and sentence for evading arrest with a motor vehicle, a third-degree felony.  (Docket Entry Nos. 1, 2).  The respondent has answered and filed a copy of the state court record.  (Docket Entry No. 17).  The respondent asserts that the petition must be dismissed because it is without merit.  (Docket Entry No. 16).  Chatman has not responded to the respondent's answer.  Based on the pleadings, the answer, the record, and the applicable law, the court denies the petition for a writ of habeas corpus. The reasons are explained below.

## I.      Background and Procedural History

### A.      Factual Background

On direct appeal, the intermediate state court of appeals summarized the relevant facts as follows:

> Officer Justin Reeves of the Willis Police Department testified that on March 24, 2017, he was aware that there was a warrant for Chatman's arrest.  While Reeves was on patrol in his marked police vehicle, an off-duty officer called him and reported that Chatman was leaving her residence in her vehicle and was heading southbound on Highway 75.  Reeves went toward Chatman's location and located

her vehicle.   Reeves saw that Chatman's vehicle did not have a license plate mounted on the front, so he decided to stop the vehicle for a traffic violation "to make sure that it was Ms. Chatman driving the vehicle[]" and he turned on his vehicle's lights and siren.  Reeves testified that he and Chatman eventually stopped in the WoodForest Bank parking lot.  According to Reeves, when he walked up to Chatman's vehicle, he told her that he was an officer with the Willis Police Department, informed her of the reason for the stop, and asked for her insurance and identification.  Reeves explained that Chatman told him she was late for an appointment with her dentist.  Upon receiving Chatman's license, Reeves returned to his vehicle and asked dispatch to verify that there was a warrant for Chatman's arrest.

Reeves explained that he contacted his partner, Officer Kenneth Elmore, as a precaution, and Elmore arrived while Reeves was waiting for a response from dispatch.  According to Reeves, dispatch responded that there was a warrant for Chatman's arrest.  Reeves testified that he returned to Chatman's vehicle and asked her to step out of the vehicle, but Chatman stated that she was not going to step out and attempted to put her vehicle into drive.  Reeves explained that at that point, he attempted to unlock and open Chatman's door, but he did not attempt to grab Chatman and did not have his gun or taser drawn.  Reeves again informed Chatman that she needed to step out of the vehicle, and he testified that Chatman drove away as he was against the car attempting to unlock and open her door.  According to Reeves, Chatman took off "down the middle of a construction zone[,]" so he knew a high-speed pursuit would ensue.

Reeves testified that he and Elmore approached speeds of 115 miles per hour while attempting to catch Chatman, and he and Elmore followed Chatman for approximately forty-six miles to Houston, and they were "swerving around cars."  Reeves described Chatman's driving as "all over" the road.  According to Reeves, Chatman sideswiped a vehicle, and in Houston, police spiked her tires, so both tires on the driver's side of her vehicle were deflated, but she tried to continue driving for approximately ten minutes before eventually stopping in a parking lot in Houston.  Reeves explained that at that point, multiple agencies were involved in the chase, and they conducted a felony stop with weapons drawn, ordered Chatman to step out of the vehicle, and arrested her.  According to Reeves, no one fired a gun or Taser at Chatman, and she was unharmed.  Video recordings of the pursuit, arrest, and the interior of Reeves's patrol car were admitted into evidence and published to the jury.

Elmore testified that he encountered Chatman when he came to back up Reeves during the initial stop.  Elmore testified that officers prefer that more than one officer be present when detaining someone who has a warrant "just in case things don't go according to plan."   According to Elmore, the warrant for Chatman's arrest was for the offense of stalking.  When Elmore arrived, he pulled alongside Reeves's patrol car.  According to Elmore, he and Reeves approached Chatman's vehicle with the intention of removing her from the vehicle, detaining

her, and advising her that there was a warrant for her arrest.  Elmore explained that the street they were on was under construction, had been shut down to two lanes, and "there were construction workers out there actively working on the road." Elmore heard Reeves ask Chatman to step out of the vehicle, and saw Reeves reach into the vehicle to try to unlock the door.  Chatman then "put it into gear and drove off."  Elmore testified that a chase began because Chatman "evaded in a motor vehicle when we were trying to detain her for a warrant."  According to Elmore, Chatman sideswiped a car, causing damage to its mirror and side.  The State rested after Elmore's testimony.

Chatman testified that she was arrested for stalking the victim, B.H., in 2013, and she pleaded guilty for the offense.  Chatman explained that she lived across the street from B.H.'s business for seven years.  According to Chatman, she was held for six months in solitary confinement and sent to a mental institution, and she was "tortured in Montgomery County jail."  Chatman explained that B.H. has contacted her "pretty much every day[ ]" since she was released from jail.  Chatman testified that B.H. was stalking her.

Chatman explained that one of the reasons she ran from the police is because of the way she was treated while she was in the Montgomery County Jail.  Chatman testified that she did not know there was a warrant for her arrest.  Chatman explained, "I felt like I had no other choice.  First time I got out [of] the car[,] they took me to jail and touched me and stuff and tortured me."  During cross-examination, Chatman admitted that she intentionally evaded arrest in a motor vehicle on March 24, 2017, and that the offense began in Montgomery County, Texas.  In addition, Chatman admitted that she drove the vehicle in a manner that could cause serious bodily injury.  Chatman explained, "I had other options, but I felt like I was backed into a corner, and that's why I d[id] what I did."  The defense rested after Chatman's testimony.  The State called B.H. in rebuttal, and B.H. testified regarding Chatman's harassment and stalking of B.H. and his wife.

*Chatman v. State*, No. 09-17-00488-CR, 2019 WL 1960420, at *1–2 (Tex. App.—Beaumont May 1, 2019).

## B.    The State Court Proceedings

Chatman was indicted in June 2017 for the third-degree felony of evading arrest or detention with the use of a deadly weapon, a motor vehicle.  (Cause Number 17-03-03868, Docket Entry No. 17-11 at 20).  Attorneys Inger H. Chandler and Willis Everett Smith were appointed to represent Chatman.  (*See* Docket Entry No. 17-35 at 70).  Chatman testified in her own defense at trial.  Much of her testimony described her belief that the man referred to as B.H. had been stalking

her for several years.  She admitted that in 2014, she had pleaded guilty to harassing B.H. and had

spent some time in the Montgomery County Jail.[1]  Chatman testified that she tried to evade the

police on March 24, 2017, because she did not want to return to that Jail.  (*See* Docket Entry No.

17-15 and Docket Entry No. 17-16).  On December 18, 2017, a jury found her guilty and sentenced

her to nine years in prison.  (Docket Entry No. 17-11 at 135–43, 151–53); *see also Chatman*, 2019

WL 1960420, at *1.  In May 2019, the Ninth Court of Appeals affirmed Chatman's conviction,

and in August 2019, the Texas Court of Criminal Appeals refused her petition for discretionary

review.  *See Chatman*, 2019 WL 1960420, at *1.

Chatman executed a state application for a writ of habeas corpus in November 2019.  (*See*

Docket Entry No. 17-35 at 57).  In her state application, Chatman challenged her conviction and

sentence on 22 grounds.  (*Id.* at 8–57).  The state district court judge ordered Chatman's trial

attorneys, Ms. Chandler and Mr. Smith, and her appellate attorney, Mr. Michael A. McDougal, to

submit affidavits responding to Chatman's claims of ineffective assistance of counsel.  (*See id.* at

69–72).  Ms. Chandler, Mr. Smith, and Mr. McDougal complied as ordered.  (*See id.* at 73–75,

89–93, 113–18).  Chatman filed a response to counsels' affidavits.  (*See* Docket Entry No. 17-22;

Docket Entry No. 17-35 at 212–16).

On May 20, 2020, the state district court judge issued an order on the state habeas

application, recommending that relief be denied.  (Docket Entry No. 17-35 at 223–29).  The state

district court judge made the following relevant findings:

> 6.  On November 13, 2019, the applicant filed an application for a writ of habeas
> corpus pursuant to article 11.07 of the Texas Code of Criminal Procedure, asserting
> twenty-two grounds for relief.

---

[1] This court uses the initials "B.H." to refer to the individual whom Chatman pleaded guilty to
harassing in 2014, following the state court of appeals opinion by using only the victim's initials.

4

7.  On December 2, 2019, this Court designated a single factual issue for resolution: whether the applicant received ineffective assistance of counsel before, during and after her trial; and the Court ordered the applicant's trial counsel, Inger Chandler and Willis Everett Smith, and her appellate counsel, Michael A. McDougal, to submit affidavits responding to certain allegations made by the applicant.

8.  All three of the applicant's former attorneys have submitted affidavits in response to the Court's order.

9.  This Court finds the affidavits of trial counsel Inger Chandler and Willis Everett Smith to be credible, and accepts as true the statements of fact set out in those affidavits.

. . .

13.  The applicant's trial counsel performed a thorough and diligent investigation of the cases against the applicant, as detailed in their credible affidavits, and the applicant has not explained how she would have benefitted from additional investigation.

14.  A private investigator, Jim McDougal, was appointed to assist the applicant's attorneys.

15.  The applicant's trial counsel discussed with Jim McDougal the results of his investigation and learned that McDougal's testimony would not benefit the applicant.

. . .

22.  Due to a condition of her bond, the applicant was required to wear an electronic ankle monitor during her trial, but the monitor was covered by her clothing and was not visible to the jury.

23.  The applicant was not prejudiced by admission of hearsay testimony that a state trooper told a witness that the applicant's vehicle struck another vehicle during the offense, because another police officer testified that he personally observed the impact.

24.  The applicant's attorneys had a reasonable basis for the decision not to offer into evidence a video recording which the applicant claimed to show the complainant in the stalking case at the applicant's residence, in light of the lack of evidence that the complainant was the person portrayed in the recording, and the complainant's credible denial that he was the person portrayed in a screen shot from the recording.

25.  The applicant's claim that she has not stalked or harassed the complainant in the stalking case—and is instead the victim of stalking—it not credible and is not supported by any credible evidence.

26.  The applicant's sworn pleadings and the affidavits she has submitted to the Court are not credible.

27.  Chandler moved for issuance of a subpoena and obtained service of the subpoena upon Julie Griffin, a television station news editor with whom the applicant communicated during the offense.

28.  Chandler did not call Griffin as a witness during the applicant's trial because the State agreed to the admission of a recording of the applicant's communications with Griffin, and there was no further need of her testimony.

29.  The applicant's appellate counsel, Michael A. McDougal, discussed with the applicant the possibility of filing a motion for "shock probation," but McDougal did not file such a motion.

30.  A former police officer who pursued the applicant's vehicle and testified at her trial, Kenneth Elmore, was subsequently convicted of two counts of tampering with a governmental record by making false entries in an incident report and arrest record in Cause Nos. 18-06-08359 and 18-06-08363 in the 221st District Court, Montgomery County, Texas.

31.  Elmore's testimony in the applicant's trial was corroborated by the testimony of the applicant and another police officer and by video recordings of the offense, and there is no credible evidence that Elmore testified falsely about any material fact during the applicant's trial.

<u>CONCLUSIONS OF LAW</u>

. . .

4.  The application includes numerous conclusory complaints regarding alleged omissions by the applicant's trial attorneys which do not set out specific facts which, if proven to be true, would support the granting of habeas corpus relief, as required by Code of Criminal Procedure article 11.07.  *See Ex parte Medina*, 361 S.W.3d 633, 637 (Tex. Crim. App. 2011).

. . .

10.  The applicant has not shown by a preponderance of the evidence that material, false testimony was introduced against her during trial.  *See Ex parte Weinstein*, 421 S.W.3d 656, 664–66 (Tex. Crim. App. 2014).

11.   The applicant's complaints about alleged prosecutorial misconduct in the admission of evidence the arguments of counsel could have been raised in her direct appeal from the judgment of conviction, and they are not cognizable in this habeas corpus proceeding.  *See Ex parte Jiminez*, 364 S.W.3d 866, 880 (Tex. Crim. App. 2012).

12.  The applicant was not eligible for "shock probation" because of the entry of a finding of the use of a deadly weapon during the commission of the offense, under the provisions of Code of Criminal Procedure articles 42A.054 and 42A.202.  *See State v. Posey*, 330 S.W.3d 311, 314–15 (Tex. Crim. App. 2011).

13.  The applicant has failed to prove by a ponderance of the evidence that she was denied her right to the effective assistance of counsel, either prior to and during her trial, or during the appeal from the judgment of conviction.  *See Strickland v. Washington*, 446 U.S. 668, 669 (1984); *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).

(*Id.*).

In September 2020, the Texas Court of Criminal Appeals denied the application, without written order, on the findings of trial court without hearing and on the court's independent review of the record.  (Docket Entry No. 17-30).

### C.    Petitioner's Federal Habeas Petition

Chatman's federal habeas petition asserts the following claims:

(1) Trial counsel provided ineffective assistance by:

(a) failing to call KTRK news editor Julie Griffin to testify;

(b) failing to call investigator Jim McDougal to testify;

(c) failing to object to the State's notice of extraneous offenses under Texas Code of Criminal Procedure, Article 38.37;

(d) failing to object to the defendant's ankle monitor during trial;

(e) failing to object to testimony regarding stalking of B.H.; and

(f) failing to object to the testimony of police officer K. Elmore;

(2) Appellate counsel provided ineffective assistance by:

(a) filing a brief without first consulting with the defendant;

(b) refusing to communicate with the defendant; and

(c) failing to file a motion for shock probation; and

(3) The prosecutor failed to disclose exculpatory evidence, made improper remarks, and knowingly introduced false evidence and false testimony.

(Docket Entry No. 1; Docket Entry No. 2).[2]

The respondent has filed an answer in response to the § 2254 petition, arguing that Chatman's claims should be dismissed because the claims are without merit.  (Docket Entry No. 16).  Chatman has not responded.

## II.    The Applicable Legal Standards

### A.    The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas corpus is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Woodford v. Garceau*, 538 U.S. 202, 205–08 (2003).   Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application  of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7–8 (2002) (quoting 28 U.S.C. § 2254(d)); *Cobb v. Thaler*, 682 F.3d 364, 372–73 (5th Cir. 2012) (same).  "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based

---

[2] To facilitate a more orderly analysis, the court has organized Chatman's claims slightly differently than Chatman presents them in her petition.

8

on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08 (2002)).  To constitute an "unreasonable application of" clearly established federal law, a state court's holding "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

When a claim concerns a question of fact, the AEDPA precludes federal habeas relief unless the state court's adjudication of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *see also Martinez v. Caldwell*, 644 F.3d 238, 241–42 (5th Cir. 2011).  A state court's factual determinations are "presumed to be correct" unless the petitioner rebuts those findings with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  This presumption of correctness extends not only to express factual findings, but also to implicit or "unarticulated findings which are necessary to the state court's conclusion of mixed law and fact." *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001)).  A federal habeas court "may not characterize these state-court factual determinations as unreasonable 'merely because [it] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  "Instead, § 2254(d)(2) requires that [a federal court] accord the state trial court substantial deference." *Id.* This court may consider only the factual record that was before the state court in determining the

reasonableness of that court's findings and conclusions. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

When a claim challenges a mixed question of fact and law, the state court's determinations are entitled to deference "unless the findings were 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.'" *Martinez*, 644 F.3d at 242 (quoting § 2254(d)(1)). Generally, federal courts presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting that same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999) ("When faced with a silent or ambiguous state habeas decision, the federal court should 'look through' to the last clear state decision on the matter."). When, however, "a state court's decision is unaccompanied by an explanation," and the lower courts did not issue a reasoned opinion, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98; *see also Salts v. Epps*, 676 F.3d 468, 480 n.46 (5th Cir. 2012) ("[W]here a state court summarily denies a petitioner's motion, and provides no statement of its reasons, 'the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'") (quoting *Harrington*, 562 U.S. at 98).

### B.   Self-Represented Litigants

Chatman represents herself. This court is required to construe petitions filed by self-represented litigants liberally. *See Hernandez v. Thaler*, 630 F.3d 420, 426 (5th Cir. 2011) ("The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to the benefit of liberal construction.") (citations omitted); *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001) ("[Petitioner]'s pro se application for habeas relief is entitled to liberal construction.") (citations

omitted).  Pleadings by self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers[.]"  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

## III.    Discussion

### A.    The Ineffective Assistance of Counsel Claims

Ineffective assistance of counsel claims are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice to the defense as a result.  *See Strickland*, 466 U.S. at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable."  *Id.* Failing to show either deficient performance or prejudice is fatal to an ineffective assistance claim. *See id.*; *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).  "Like AEDPA, *Strickland* establishes a deferential standard," and in order to prevail on an ineffective assistance of counsel claim in a § 2254 proceeding, a petitioner "must prove both that his counsel's performance was objectively deficient and that his counsel's deficiency prejudiced him, and that no reasonable jurist could conclude otherwise."  *Williams v. Thaler*, 684 F.3d 597, 604 (5th Cir. 2012); *see also Harrington*, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688; *see also Harrington*, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing *Strickland*, 466 U.S. at 690).  This is a "highly

deferential" inquiry, in which "counsel is strongly presumed to have rendered adequate assistance" and that the challenged conduct was the product of reasoned trial strategy. *Strickland*, 466 U.S. at 689–90; *see also Pape v. Thaler*, 645 F.3d 281, 292 (5th Cir. 2011). To overcome this presumption, a defendant must identify counsel's acts or omissions that did not result from reasonable professional judgment. *Strickland*, 466 U.S. at 690. Counsel's error, even if professionally unreasonable, does not warrant setting aside a conviction if the error had no effect on the outcome. *Id.* at 691 (citation omitted). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "In short, a petitioner cannot demonstrate prejudice by showing that, but for counsel's deficient performance, he would have been entitled to a new trial under state law. Rather, a petitioner must also demonstrate that counsel's deficient performance rendered the result of his trial unreliable or the proceeding fundamentally unfair." *Green*, 160 F.3d at 1043 (internal citation omitted).

The state habeas court considered and rejected Chatman's ineffective assistance of counsel claims. "[T]he test for federal habeas purposes is *not* whether [the petitioner] made [the showing required by *Strickland*]." *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003). "Instead, the test is whether the state court's decision—that [the petitioner] did *not* make the *Strickland*-showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim." *Id.* A petitioner's conclusory allegations of ineffective assistance of counsel will fail to rebut a state court's finding that his counsel was not deficient or that he was not prejudiced by his counsel's performance. *See Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983). "An assertion is conclusory if it relies on inferences without also setting forth the facts that support those inferences." *Favela v. Collier*,

12

No. 22-40415, 91 F.4th 1210, 1213 (5th Cir. Jan. 31, 2024) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 898–99 (1990) and Black's Law Dictionary (11th ed. 2019)).

1.     The Claim of Counsel's Failures to Call Witnesses

Chatman claims that her attorneys provided ineffective assistance by failing to call an investigator, Jim McDougal, and a television news editor, Julie Griffin, to testify at trial.  (Docket Entry No. 2 at 4, 8).

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted); *see also Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).  "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."  *Day*, 566 F.3d at 538 (citation omitted).

a.     The claim that counsel failed to call McDougal to testify

Chatman argues that her trial attorneys provided ineffective assistance by failing to call Jim McDougal of JAMAC Investigations to testify.  (Docket Entry No. 2 at 4).  Chatman alleges that McDougal did not find any evidence of her stalking B.H. and suggested that Chatman "file a lawsuit as soon as she gets out of jail."  (*Id.*).

Chatman presented this claim in her state habeas application.  As part of the state habeas proceeding, the state district court judge instructed Chatman's trial attorneys to answer the following questions: "Did you interview private investigator Jim McDougal?  If so, what

information regarding the applicant did McDougal provide to you?  Why did you choose not to

call McDougal as a witness?"  (Docket Entry No. 17-35 at 70).  Mr. Smith explained in his affidavit

that the decision not to call McDougal was part of his trial strategy:

> Yes I did [interview McDougal. He] had no information that was helpful.  Ms.
> Chatman wanted him to find information on the complaining witness [B.H.] that
> would confirm the fact that he was working with the police to conspire against her
> but that could not be found, so her story could not be confirmed.  That is why he
> was not called as a witness.

(*Id.* at 90).

Ms. Chandler also filed an affidavit, stating her own belief that calling McDougal did not

fit with the defense trial strategy:

> Yes.  Mr. McDougal kept in touch with me throughout my representation of Ms.
> Chatman; in fact, Mr. McDougal had been involved with Ms. Chatman's case from
> the beginning with her previously appointed counsel.  Mr. McDougal investigated
> Ms. Chatman's numerous complaints about the stalking allegation; namely, that the
> stalking complainant was actually stalking her, that he was working with police to
> set her up, and that the police lied about having a warrant for her arrest.  Mr.
> McDougal was not called as a witness because I did not believe his testimony would
> assist in our trial strategy nor did I believe his testimony was helpful to Ms.
> Chatman.

(*Id.* at 114).

After considering Chatman's state writ application, the affidavits from her attorneys, and

Chatman's response to the attorneys' affidavits, the state habeas court found that "[a] private

investigator, Jim McDougal, was appointed to assist the applicant's attorneys" and that "[t]he

applicant's trial counsel discussed with Jim McDougal the results of his investigation, and learned

that McDougal's testimony would not benefit the applicant."  (*Id.* at 225).  The state habeas court

ultimately concluded that Chatman "has failed to prove by a ponderance of the evidence that she

was denied her right to the effective assistance of counsel, either prior to and during her trial, or

during the appeal from the judgment of conviction. *See Strickland v. Washington*, 446 U.S. 668, 669 (1984); *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999)." (*Id.* at 228).

Chatman has not submitted an affidavit or other sworn statement from McDougal identifying the substance of his potential testimony and whether he was available for trial and willing to testify. Absent an affidavit or declaration from the uncalled witness, Chatman's claim is speculative and conclusory and does not demonstrate deficient performance or prejudice. *See Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001). Chatman has also failed to overcome the *Strickland* presumption that her attorneys' choice not to call McDougal as a witness was based on a reasonable belief, formed after investigation, that his testimony would not be helpful to Chatman's defense. *See Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (explaining that federal courts must "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." (cleaned up); *Cotton v. Cockrell*, 343 F.3d 746, 752–53 (5th Cir. 2003) (Only when "[a] conscious and informed decision on trial tactics and strategy . . . is so ill chosen that it permeates the entire trial with obvious unfairness" can it be the basis for finding constitutionally ineffective assistance of counsel.) (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)). The respondent is entitled to dismissal of this claim.

b. <u>The claim that counsel failed to call Griffin to testify</u>

Chatman claims that the audio/video recording played at trial of her exchange with Griffin during the police chase violated the Confrontation Clause because Griffin was not present to testify at trial.[3] (*See* Docket Entry No. 2 at 8).

---

[3] During the state habeas proceeding, Chatman did not make a claim that Griffin not testifying at trial violated her rights under the Confrontation Clause. Instead, she argued that trial counsel was ineffective for relying on the State to subpoena Griffin. (*See* Docket Entry No. 17-35 at 25–26). Because Chatman did not exhaust the claim that counsel failing to call Griffin violated her rights under the Confrontation Clause before the state habeas court, this claim has been procedurally defaulted and is barred from consideration by this court. *See* 28 U.S.C. § 2254(b)(1)(A); *Ries v. Quarterman*, 522

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend VI. The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

At trial, Chatman testified about calling Channel 13 News during the police chase and speaking with Griffin, an editor at the station. (Docket Entry No. 17-16 at 29). Chatman's phone call with Griffin during the high-speed chase was admitted into evidence and played at trial. (*Id.* at 30–31). After the phone call was played, Chatman testified as to what she was thinking when she spoke to Griffin and why she called the newsroom:

> Q.   Okay. And, basically speaking, [Griffin's] talking to you. What's going on in your head at this point?
>
> A.   I'm, like, thinking about Trayvon Martin, I'm thinking about Michael Brown, I'm thinking about everybody. I was like they going to kill me.
>
> Q.   Okay. And, basically speaking, where were you going? What was your purpose, where were you going?
>
> A.   I didn't have a plan. I was at Channel 13 at that time, but I really didn't have a plan. I just knew prior to they had took my phone and deleted evidence. So I wanted to get my phone to the news station.
>
> Q.   Okay.
>
> A.   I didn't make it there, and my phone vanished again.
>
> Q.   Now, this news station is in Harris County. Right?
>
> A.   Yes.

---

F.3d 517, 523 (5th Cir. 2008); *Picard v. Connor*, 404 U.S. 270, 276 (1971). Although the respondent did not raise the procedural default bar, this court may on its own raise the procedural defense of exhaustion and dismiss a claim for failure to exhaust state-court remedies. *See United States v. Castro*, 30 F.4th 240, 245 (5th Cir. 2022). In addition to dismissal for failure to exhaust, the claim, alternatively, may be dismissed on its merits, as discussed above.

16

> Q.      So you weren't going to go back to Montgomery County?
>
> A.      I did not want to go to Montgomery County jail.
>
> Q.      Why?
>
> A.      Because I was tortured in Montgomery County jail.  I was scared of Montgomery County jail.

(*Id.* at 32–33).

As part of the state habeas proceeding, the state district court judge instructed Chatman's trial attorneys to answer the following questions: "Why did you not call as a witness a KTRK news editor Julie Griffin?  Would Griffin's testimony about the applicant's side of their telephone conversation during the police chase have been of any value to the applicant's case?"  (Docket Entry No. 17-35 at 71).

Mr. Smith responded in his affidavit:

> Not at all.  There was a video admitted at trial of the telephone call that [Griffin] had with Ms. Chatman while Ms. Chatman was fleeing from the police.  You could not hear the questions that Ms. Chatman was asking her but Ms. Griffin was doing a good job of repeating Ms. Chatman's concerns and reacting to what Ms. Chatman was asking her.  She was also advising her to pull over, put her hands up and surrender to the police.  Her testimony was not needed because the video was admitted into evidence and it would have confirmed what the jury had already heard as to Ms. Chatman's state-of-mind.  Ms. Chatman also testified about the content of the video after it was played during her direct examination as to her state of mind, so Ms. Griffin's presence was not necessary.

(*Id.* at 90).

Ms. Chandler also filed an affidavit responding to the court's question:

> Ms. Chatman contacted KTRK for assistance while she was being pursued by police.  Julie Griffin stayed on the phone with Ms. Chatman until the time of her arrest, and appeared to be following along with the live-feed of Ms. Chatman's pursuit (that was being aired by KTRK helicopter) during the call.  As part of our trial strategy, we wanted to introduce a cellphone video that was taken in the newsroom while this phone conversation took place that had been provided to us by the State through discovery.  The State initially included Ms. Griffin on their

subpoena, but when they did not call her to testify nor introduce the video into evidence (and told us they would object if we tried to admit the video without Ms. Griffin), we obtained a subpoena of our own.

When KTRK filed a motion to quash our subpoena, the State agreed to stipulate to the authenticity of the video and allow us to introduce it into evidence without Ms. Griffin as a sponsoring witness. Once the video was in evidence, there was no need for Ms. Griffin's live testimony. Though you could not hear what Ms. Chatman was saying on the other end of the line, Ms. Griffin was repeating some of Ms. Chatman's comments and concerns to the others in the newsroom and reacting to what Ms. Chatman was saying to her. In truth, the video was the best evidence of the conversation between Ms. Griffin and Ms. Chatman, as the jury was able to see Ms. Griffin's body language and hear the tone of her voice.

(*Id.* at 115).

The state habeas court ultimately rejected Chatman's claims concerning the failure to call Griffin to testify, finding that:

27.   Chandler moved for issuance of a subpoena and obtained service of the subpoena upon Julie Griffin, a television station news editor with whom the applicant communicated during the offense.

28.   Chandler did not call Griffin as a witness during the applicant's trial because the State agreed to the admission of a recording of the applicant's communications with Griffin, and there was no further need of her testimony.

(*Id.* at 226). The state habeas court found that Chatman failed to prove that she was denied effective assistance of counsel. (*See id.* at 228).

The affidavits from trial counsel make clear that the purpose of playing the recording of Griffin's telephone call with Chatman was to show state of mind. Because the video was admitted for this nonhearsay purpose, it did not violate the Confrontation Clause. *See* Fed. R. Evid. 803; *Crawford*, 541 U.S. at 59, n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.") (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)); *United States v. Rodriguez*, 484 F.3d 1006, 1013–14 (8th Cir. 2007) (an out-of-court statement admitted to show the defendant's state of mind does not implicate

the Confrontation Clause); *United States v. Flores*, 725 F. App'x 478, 482 (9th Cir. 2018) (statements offered to prove a witness's state of mind are not testimonial and did not violate the Confrontation Clause).

Chatman has failed to show that the state courts' determination was contrary to, or involved an unreasonable application of, *Strickland*, or that the decision involved an unreasonable determination of the facts based on the evidence in the record.  No basis for habeas relief is shown, and the respondent is entitled to dismissal of this claim.

### 2.    *The Claim of Counsels' Failure to Object*

Chatman alleges several instances of her counsel failing to object at trial.  Chatman alleges that trial counsel provided constitutionally deficient representation by failing to object to the State's notice of extraneous offenses under Texas Code of Criminal Procedure Article 38.37; to the defendant's ankle monitor during trial; to testimony about stalking B.H., and to the testimony of Officer K. Elmore.  (Docket Entry No. 1 at 6; Docket Entry No. 2 at 4–7).

A failure to object does not constitute ineffective assistance of counsel if there is no sound basis for the objection.  *See Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012).  The Fifth Circuit "has made clear that counsel is not required to make futile motions or objections." *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (citing *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (per curiam)).  The "failure to object . . . is generally a matter of trial strategy . . . which . . . will not [be] second guess[ed] . . . ." *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993).  Indeed, "deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed." *Thomas v. Thaler*, 520 F. App'x 276, 281 (5th Cir. 2013) (per curiam) (citing cases).

a.   The claim of counsel failing to object to the State's notice of extraneous offenses under Texas Code of Criminal Procedure, Article 38.37

Chatman argues that trial counsel should have objected to the State's notice of extraneous acts under Article 38.37 of the Texas Code of Criminal Procedure. (Docket Entry No. 2 at 4). She asserts that "Art[icle] 38.37 speaks of sexual offenses committed against a child under 17 yrs of age. Counsel failed to object to derogatory Article." (*Id.*).

Article 38.37 of the Texas Code of Criminal Procedure "permits admission of evidence that a defendant charged with sexual or assaultive offenses against a child under 17 years of age has committed a separate offense including sexual offenses or assaultive offenses against a child under 17 years of age for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." *Haden v. Director, TDCJ-CID*, Case No. 6:19-cv-566, 2022 WL 2345742, at *4 (E.D. Tex. June 29, 2022). A federal habeas court "does not sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (citation omitted). A state trial court's evidentiary rulings mandate habeas relief only when "errors are so extreme that they constitute a denial of fundamental fairness." *Id.* (citation omitted); *see also Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007).

In the challenged state criminal case, Chatman was not charged with sexual or assaultive offenses against a child; she was charged with evading arrest with a motor vehicle. Chatman has not shown that the State attempted to admit evidence under Article 38.37 or that evidence showing that she committed sexual or assaultive offenses against a child was admitted under Article 38.37.

No basis for habeas relief is shown, and the respondent is entitled to dismissal of this claim.

> b. The claim that counsel failed to object to the defendant's ankle
> monitor during trial

Chatman claims that counsel failed to object to her ankle monitor during trial, which she claims was "present in front of the jury." (Docket Entry No. 2 at 7). Chatman asserts that she was brought into the courtroom after the jury was seated, that she shared a restroom with the jury, that a "veniremen commented on how much she loved defendant['s] shoes," that she had to walk in front of the jury several times to testify, and that she saw several members of the jury before court started. (*Id.* at 7–8).

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976) (citing *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under [the American] system of criminal justice." *Id.* "The physical appearance of a defendant while in the presence of the jury may adversely affect the presumption of innocence." *Chavez v. Cockrell*, 310 F.3d 805, 808 (5th Cir. 2002) (citing *Estelle*, 425 U.S. at 504). A jury's brief and inadvertent exposure to a defendant in handcuffs or other restraints "is not prejudicial and requires an affirmative showing of prejudice by the defendant." *Wright v. Texas*, 533 F.2d 185, 187 (5th Cir. 1976) (citations omitted); *see also United States v. Diecidue*, 603 F.2d 535, 549 (5th Cir. 1979) ("This Court has declared . . . that brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice.") (citation omitted); *White v. Johnson*, 111 F.3d 892, 1997 WL 156829, at *8 (5th Cir. 1997) ("A defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendants in handcuffs.").

As part of the state habeas proceeding, the state district court judge instructed Chatman's trial and appellate attorneys to respond to certain questions about their representation of Chatman.

In his affidavit responding to Chatman's state habeas application, Mr. Smith addressed Chatman's allegation that he provided ineffective assistance by failing to object to the ankle monitor:

> The ankle monitor was worn UNDER the clothes Ms. Chatman had on so she was not made to appear before the jury with the ankle monitor on display. There was no occasion that I recall where the jurors would have known or seen it since she did not wear a dress and we sat at counsel table almost the entire trial. She did take the witness stand to testify on her own behalf the last day of trial, but that lasted about 40 Minutes total. If she believed that the Jurors were able to notice the electronic monitor on her ankle she did not mention that to me or my co-counsel.

(Docket Entry No. 17-35 at 90).

Ms. Chandler also filed an affidavit responding to Chatman's allegation:

> Ms. Chatman was required by the court, as a condition of bond, to wear an ankle monitor. She was made to appear in court wearing an ankle monitor, but I do not recall it ever being on display in front of the jury. As I recall, Ms. Chatman, sat at the far end of counsel table (farthest from the jury) with her legs out of sight. Had I been concerned that the jury was aware of the ankle monitor, I would have objected to it.

(*Id.* at 115).

After considering Chatman's state writ application, the affidavits from her attorneys, and Chatman's response to the attorneys' affidavits, the state habeas court rejected Chatman's claim that her trial attorneys provided ineffective assistance of counsel, finding that "[d]ue to a condition of her bond, the applicant was required to wear an electronic ankle monitor during her trial, but the monitor was covered by her clothing and was not visible to the jury." (*Id.* at 225).

The record does not show that any jurors were aware that Chatman was wearing an ankle monitor. Even considering Chatman's allegations that she shared a bathroom with the jurors, a juror commented that she liked Chatman's shoes, and that she had to walk in front of the jurors several times to testify, such allegations, at most, indicate a brief encounter where jurors *may* have caught a glimpse of Chatman's ankle monitor. Chatman has failed to show that she was prejudiced by the mere possibility of a juror seeing her ankle monitor.

Chatman has failed to show that the state courts' determination was contrary to, or involved an unreasonable application of, *Strickland*, or that the decision involved an unreasonable determination of the facts based on the evidence in the record.  No basis for habeas relief is shown, and the respondent is entitled to dismissal of this claim.

           c.    <u>The claim that counsel failed to object to testimony about Chatman stalking B.H.</u>

Chatman asserts that despite providing her attorneys with video, audio, photos, and text messages of B.H. "harassing and threatening her life," her attorneys provided ineffective assistance when they did not "object to testimony of stalking" and when they failed to have the stalking charge dismissed before trial.  (Docket Entry No. 2 at 4).  Chatman argues that the failure to have the stalking charge dismissed before trial led to jury confusion.  (*Id.* at 4–5).

Chatman's attorneys were not deficient for failing to have the previous stalking charge "dismissed" before trial because the attorneys could not have done so. Chatman had already pleaded guilty to harassing B.H. in 2014.  (*See* Docket Entry No. 17-15 at 161–63, 171; Docket Entry No. 17-16 at 9, 20, 82) (Chatman testified that in 2013 she was arrested and charged with stalking B.H. and pleaded guilty to harassing B.H. in 2014); (Docket Entry No. 17-20 at 5–6) (State's Exhibit 84, Misdemeanor Judgment and Order for harassment, dated 8/20/2024).  Chatman testified extensively about her arrest and conviction for harassing B.H. because she used her experience as an inmate in the Montgomery County Jail after that arrest and conviction to explain her efforts to evade police.  Chatman testified that she had had such a bad experience in that jail that she fled police to avoid being sent back to the jail.  (*See* Chatman's trial testimony in Docket Entry No. 17-15 and Docket Entry No. 17-16).

When the State called B.H. as a witness at Chatman's trial, her counsel made several objections to his testimony, at least one of which was sustained.  (*See, e.g.*, Docket Entry No. 17-

16 at 128).   The State was permitted to call B.H. as a witness at trial, and Chatman's attorneys objected to his testimony where appropriate.   Chatman does not point to any particular testimony of B.H.'s that her attorneys should have objected to but did not.   Nor does Chatman show how any of B.H.'s testimony made the result of the trial unreliable or the proceeding fundamentally unfair.

As part of the state habeas proceeding, the state district court judge instructed Chatman's trial attorneys to respond to the following questions: "Did the applicant provide you with a video recording that depicted [B.H.] at the applicant's residence?  If so, why did you choose not to offer the video recording into evidence?"  (Docket Entry No. 17-35 at 71).  In his affidavit responding to the state habeas court's questions, Mr. Smith responded:

> No, I don't recall that at all.  I remember we had a photo admitted into evidence (D-3) of whom Ms. Chatman said was [B.H.] standing next to a flatbed truck but the individual had his back turned.  [B.H.] denied that was him in the photo at trial and he denied that his voice was on a recording that we played at trial tried under an offer of proof.

(*Id.* at 92).

In her affidavit, Ms. Chandler responded:

> I believe the video Ms. Chatman is referring to is one of many videos and audio recordings she posted on her Facebook page that she believed were of/from [B.H.]. There was no direct evidence that the person depicted in the video was [B.H.]. When [B.H.] testified during the punishment phase of trial, we utilized a still-shot from the video during our cross-examination.  He denied being the person in the image.

(*Id.* at 117).

In rejecting this claim on collateral review, the state habeas court made the following relevant findings:

> 24.  The applicant's attorneys had a reasonable basis for the decision not to offer into evidence a video recording which the applicant claimed to show the complainant in the stalking case at the applicant's residence, in light of the lack of evidence that the complainant was the person portrayed in the recording, and the

complainant's credible denial that he was the person portrayed in a screen shot from the recording.

25.  The applicant's claim that she has not stalked or harassed the complainant in the stalking case—and is instead the victim of stalking—it not credible and is not supported by any credible evidence.

26.  The applicant's sworn pleadings and the affidavits she has submitted to the Court are not credible.

(*Id.* at 226).  The state habeas court found that Chatman failed to prove that she was denied effective assistance of counsel.  (*See id.* at 228).

Chatman has failed to show that the state courts' determination was contrary to, or involved an unreasonable application of, *Strickland*, or that the decision involved an unreasonable determination of the facts based on the evidence in the record.  Chatman is not entitled to habeas relief on this ground.

> d.   The claim that counsel failed to object to the testimony of Officer K. Elmore

Chatman argues that her attorneys provided ineffective assistance when they failed to object to the testimony of Officer Elmore because, at the time of trial, Elmore was no longer a police officer, but he was allowed to testify while wearing a police uniform.  (Docket Entry No. 2 at 6; Docket Entry No. 1 at 6).  Chatman further claims that before trial, Elmore had been arrested for tampering with governmental documents and that Elmore's arrest "was kept from" her. (Docket Entry No. 2 at 6).  She alleges that Elmore testified falsely against her in retaliation for her complaints about the Willis Police Department and that he received a lighter sentence as a result of his testimony.  (*Id.*).   She also claims that her attorneys failed to object to his testimony that a Department of Public Safety officer saw Chatman sideswipe a car as hearsay.  (*Id.*).

First, Chatman's allegations that Elmore provided false testimony against her in retaliation for her complaints about the Willis Police Department are conclusory.  A petitioner's conclusory

allegations of ineffective assistance of counsel will fail to rebut a state court's finding that counsel was not deficient or that counsel's performance was not prejudicial. *See Ross*, 694 F.2d at 1011–12.

Second, Chatman has not shown that her defense attorneys knew about the charges against Elmore or that his testimony was allegedly false.  To the contrary, when Chatman asserted this claim before the state habeas court, the court found that Elmore's testimony at trial was supported by the evidence, including Chatman's own testimony:

> 30.  A former police officer who pursued the applicant's vehicle and testified at her trial, Kenneth Elmore, was subsequently convicted of two counts of tampering with a governmental record by making false entries in an incident report and arrest record in Cause Nos. 18-06-08359 and 18-06-08363 in the 221st District Court, Montgomery County, Texas.
>
> 31.  Elmore's testimony in the applicant's trial was corroborated by the testimony of the applicant and another police officer and by video recordings of the offense, and there is no credible evidence that Elmore testified falsely about any material fact during the applicant's trial.

(Docket Entry No. 17-35 at 226–27).  Chatman testified that after she was stopped by a police officer, she drove away in an attempt to evade the officer because she did not want to be returned to the Montgomery County Jail.  (*See, e.g.*, Docket Entry No. 17-16 at 35, 46, 50–53, 46, 51–53). Another police officer, Justin Reeves, also testified that he pulled Chatman over for failing to have a license plate mounted to the front of her vehicle, and that when he instructed her to step out of her vehicle, she refused and instead drove away. (Docket Entry No. 17-15 at 11–25).  Video of the incident was also admitted at trial.  As discussed by the state habeas court, Elmore's testimony was corroborated by multiple pieces of other evidence at trial.

Chatman's attorneys' failure to object to Elmore's testimony about an officer's statement that he saw Chatman sideswipe a car does not demonstrate deficient performance.  At trial, the State played a video recording of the car chase captured by Elmore's dashcam camera.  As the

26

video played, the prosecutor asked Elmore questions about the chase.  After Elmore testified how police officers in Houston used spike strips in an effort to stop Chatman, the following exchange happened between the prosecutor and Elmore:

> Q.   I'll start right here where we left off.  I'm going to pause here at 10:34:42.  We just heard dispatch say something about striking another vehicle; is that right?
>
> A.   It was actually the officers in the Oak Ridge unit that said that; but, yes.
>
> Q.   Were you able to see that?
>
> A.   Yes.
>
> Q.   What did you see happen?
>
> A.   She sideswiped this red car here and damaged the mirror and scraped the side of the vehicle.

(Docket Entry No. 17-15 at 120–21).  Elmore clarifying that it was officers from Oak Ridge, and not an officer at dispatch, who could be heard on the video stating that Chatman struck another vehicle, is not hearsay.  Moreover, Elmore testified that he saw Chatman sideswipe another vehicle.  Because there was no sound basis for her attorneys to object to Elmore's testimony on this point, Chatman's assertion that they provided ineffective assistance by failing to object must fail.  *Koch*, 907 F.2d at 527 ("This Court has made clear that counsel is not required to make futile motions or objections.") (citing *Murray*, 736 F.2d at 283).

Chatman has failed to show that the state courts' determination was contrary to, or involved an unreasonable application of, *Strickland*, or that the decision involved an unreasonable determination of the facts based on the evidence in the record.  No basis for habeas relief is shown, and the respondent is entitled to dismissal of this claim.

27

### B.        Ineffective Assistance of Appellate Counsel

Chatman argues that the attorney who represented her during her direct appeal, Mr. Michael McDougal, provided ineffective assistance by raising only one issue on appeal, for failing to consult with her prior to filing the appellate brief, for refusing to communicate with her, and for failing to file a motion for shock probation.[4]   (Docket Entry No. 1 at 7; Docket Entry No. 2 at 9–10).

Ineffective assistance of appellate counsel claims are also governed by the *Strickland* standard.   *See Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006).   A habeas petitioner must demonstrate that his attorney's representation was deficient and that the deficient performance caused his prejudice.   *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). A court's review of counsel's conduct is deferential.   *Amador*, 458 F.3d at 410.   "On appeal,

---

[4] In her federal habeas petition, Chatman also claims that Mr. McDougal provided ineffective assistance on appeal for failing to file a motion for a new trial and a motion to set aside the judgment. (Docket Entry No. 1 at 7; Docket Entry No. 2 at 9–10).   Chatman, however, did not make these claims during the state habeas proceeding.   Because Chatman did not exhaust the claims that appellate counsel provided ineffective assistance for failing to file motions for a new trial and to set aside the judgment, such claims have been procedurally defaulted and are barred from consideration by this court.   *See* 28 U.S.C. § 2254(b)(1)(A); *Ries*, 522 F.3d at 523; *Picard*, 404 U.S. at 276.   Although the respondent did not raise the procedural default bar, this court may *sua sponte* raise the procedural defense of exhaustion and dismiss a claim for failure to exhaust state-court remedies.   *See Castro*, 30 F.4th at 245.   Even if Chatman had exhausted these claims, they are meritless because such motions would not have been granted.   Article 40.001 of the Texas Code of Criminal Procedure provides that "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial."   To be entitled to a new trial on the basis of newly discovered evidence, a defendant must show: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial.   *Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014).   Because Chatman has not shown that her case satisfies any of these requirements, a motion for a new trial would not have been granted.   *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim.").   Similarly, Chatman has not demonstrated that a motion to set aside the judgment would have been successful.   Counsel was not deficient for failing to file such motion.   *See id.*

effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available." *Green*, 160 F.3d at 1043; *see also Reese v. Delo*, 94 F.3d 1177, 1185 (8th Cir. 1996) ("[C]ounsel has discretion to abandon losing issues on appeal.") (citation omitted).   To demonstrate prejudice on appeal, a petitioner must show that "the outcome of the . . . appeal . . . would have been different." *Amador*, 458 F.3d at 411.

Chatman presented this claim in her state habeas application.   Mr. McDougal submitted the following affidavit in response to the state district court judge's questions about his representation of Chatman:

> 1.      I met with Chatman one time on June 11, 2018, to talk to her about what issues she felt were raised in the trial which could be appellate points.  I don't really recall how much time we spent, but it was probably close to 30 minutes.  Additional time would not have been productive to further her appeal because there were no valid issues to be raised.  I did not want to file an *Anders* brief, so I raised the issue of faulty jury charge and no amount of consultation with Chatman would have added to the issue.
>
> 2.      I did not file a motion for "shock" probation for Chatman.  I remember when I spoke to Chatman during my visit with her in Lockhart, she asked about filing a Motion for Shock Probation.  I told her I would look into it, if the time limit to file one had not expired.  I thought the time limit had expired because I was the second lawyer appointed to be her appellate lawyer.  I was appointed to do the appeal on May 31, 2018; Chatman was sentenced on December 18, 2017.  The time limit for filing a "shock" probation motion is 180 days, so I had about 18-20 days to file such a motion.  After reviewing all of material [sic] in the clerk's record and the reporter's record, and being aware that a jury assessed a nine-year prison sentence for Chatman (when she was eligible for probation), I did not feel that filing a motion for "shock" probation would have been productive.  My reasoning on this was based on my experience as a criminal defense lawyer in Montgomery County from 1978 to 1996, Montgomery County District Attorney from 1997 to 2009, and a criminal defense lawyer again in Montgomery County from 2009 to the present time; I had never before seen a Montgomery County District Judge grant a motion for "shock" probation after a defendant was sentenced to penitentiary time by a jury.
>
> I do not feel the lack of a motion for "shock" probation prejudiced applicant.

(Docket Entry No. 17-35 at 73–74).

In rejecting this claim on collateral review, the state habeas court found that "Michael A. McDougal[] discussed with the applicant the possibility of filing a motion for 'shock probation,' but McDougal did not file such a motion." (*Id.* at 226). The habeas court concluded that Chatman "was not eligible for 'shock probation' because of the entry of a finding of the use of a deadly weapon during the commission of the offense, under the provisions of Code of Criminal Procedure articles 42A.054 and 42A.202. *See State v. Posey*, 330 S.W.3d 311, 314–15 (Tex. Crim. App. 2011)." The habeas court concluded that Chatman had "failed to prove by a ponderance of the evidence that she was denied her right to the effective assistance of counsel, either prior to and during her trial, or during the appeal from the judgment of conviction." (*Id.* at 228).

The Fifth Circuit has held that "appointed counsel prosecuting an appeal on an adequate trial record" is not required to confer with his client about the issues presented on appeal. *Hooks v. Roberts*, 480 F.2d 1196, 1197 (5th Cir. 1973); *see also Raymer v. Stephens*, No. H-13-1338, 2014 WL 4734971, at *28 (S.D. Tex. Sept. 23, 2014) ("Appellate counsel is not required to consult with his client about the legal issues to be presented on appeal.") (citing *Hooks*, 480 F.2d at 1197); *Cruz-Reyes v. United States*, No. 1:15-cv-071, 2016 WL 1715339, at *4 (S.D. Tex. Apr. 5, 2016) ("[A]ppellate counsel is not required to confer with a client about the issues presented on appeal, regardless of any preferred practice.") (citing *Hooks*, 480 F.2d at 1197), *R&R adopted by*, 2016 WL 1718266 (S.D. Tex. Apr. 27, 2016). Further, "brevity of consultation time with the client does not establish a claim for ineffective assistance of counsel unless a defendant can show what benefit would have resulted from more consultation time." *United States v. Bernard*, 762 F.3d 467, 478 (5th Cir. 2014) (citing *Schwander*, 750 F.2d at 499). Chatman has not met her burden to show what benefit would have resulted from additional consultation time with Mr. McDougal, that other issues briefed on appeal would have been successful, or that a motion for shock probation would

have been granted.  Mr. McDougal explained why he did not file a motion for shock probation and why he raised a single issue on direct appeal, and the state habeas court ultimately concluded that Mr. McDougal did not provide ineffective assistance.  The Texas Court of Criminal Appeals expressly relied on these findings, as well as its own independent review of the record, in denying habeas relief.

The state habeas court found that Chatman failed to meet her burden on her ineffective assistance of counsel claims, and the court denied the claims.  This court must "defer 'both to trial counsel's reasoned performance and then again to the state habeas court's assessment of that performance.'"  *Sanchez v. Davis*, 936 F.3d 300, 305 (5th Cir. 2019) (citing *Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017)).  Chatman has failed to show that the state courts' determination was contrary to, or involved an unreasonable application of, *Strickland*, or that the decision involved an unreasonable determination of the facts based on the evidence in the record.  Chatman is not entitled to habeas relief on her ineffective assistance of appellate counsel claims, and the respondent is entitled to dismissal of these claims.

### C.     The prosecutor made improper remarks during closing argument, knowingly introduced false evidence and false testimony, and failed to disclose exculpatory evidence

Chatman claims that the prosecutor made improper remarks and knowingly introduced false evidence and false testimony.  (Docket Entry No. 1 at 7; Docket Entry No. 2 at 10–13).  These two claims are barred from consideration by this court because the claims were rejected on state habeas corpus review for procedural reasons:

> 11.   The applicant's complaints about alleged prosecutorial misconduct in the admission of evidence and the arguments of counsel could have been raised in her direct appeal from the judgment of conviction, and they are not cognizable in this habeas corpus proceeding.  *See Ex parte Jiminez*, 364 S.W.3d 866, 880 (Tex. Crim. App. 2012).

(Docket Entry No. 17-35 at 228).  The state habeas court recommended that relief be denied.  (*Id.* at 229).  The Texas Court of Criminal Appeals then denied relief without written order based on findings of trial court and the court's independent review of the record.  (Docket Entry No. 17-30).

The Texas Court of Criminal Appeals has repeatedly held that claims that could have been raised on direct appeal may not be raised in a state habeas application.  *See Ex parte Gardner*, 959 S.W.2d 189, 199–200 (Tex. Crim. App. 1998); *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989).  A federal habeas court "will not consider a claim that the last state court rejected on the basis of an adequate and independent state procedural rule."  *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (citations omitted).  Thus, these claims are procedurally barred unless Chatman demonstrates cause and prejudice or a fundamental miscarriage of justice.  Chatman has not made such showing.  Chatman is barred from raising her claims regarding the prosecutor's comments during closing argument and knowingly introducing false evidence and testimony.  The claims must be dismissed.

Alternatively, for the reasons discussed below, the claims may also be dismissed on their merits.

### 1. The claim of the prosecutor making improper remarks

Chatman argues that the prosecutor made improper comments when the prosecutor stated that the defendant "'pimps' minors" and is the "queen of Backpage," as these comments made it sounds like she "is a child molester."  (Docket Entry No. 1 at 7; Docket Entry No. 2 at 9).  She also argues that the prosecutor's comments that she violated a protective order and harassed B.H. from 2007 to 2013 were improper.  (Docket Entry No. 1 at 7).

"Improper remarks by a prosecutor 'are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair.'"  *Hughes v. Quarterman*, 530

F.3d 336, 347 (5th Cir. 2008) (quoting *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002)).

"Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced

misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no

conviction would have occurred." *Id.* (quoting *Harris*, 313 F.3d at 245). "The relevant question

is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *Id.* (quoting *Darden v. Wainright*, 477 U.S. 168, 181 (1986)).

Chatman objects to the prosecutor's statement that she violated a protective order and

harassed B.H. from 2007 to 2013. She does not, however, cite the trial record or provide a direct

quotation of the allegedly improper remark, so the court cannot tell exactly what statement she is

challenging. The prosecutor arguing in closing that Chatman violated a protective order or

harassed B.H. for several years would not have been improper argument because any reference to

those incidents is simply the prosecutor summarizing previous trial testimony and evidence.

Among other evidence, B.H. testified that Chatman had stalked and harassed his family for several

years. Chatman herself testified that she was arrested in 2013 for stalking B.H. and that she

pleaded guilty to harassing B.H. The court judgment from the harassment case was admitted at

trial. (*See, e.g.*, Docket Entry No. 17-15 at 161–62; Docket Entry No. 17-16 at 9, 37, 82). Such

comments by the prosecutor on these issues did not render the trial fundamentally unfair. *See,*

*e.g.*, *Duran v. Stephens*, No. MO:14-cv-73, 2015 WL 12910763, at *8–9 (W.D. Tex. Mar. 6, 2015)

(finding that a prosecutor's closing argument was not improper when the prosecutor was simply

summarizing the evidence); *Walton v. Stephens*, No. CV H-14-2370, 2015 WL 13912106, at *14

(S.D. Tex. June 22, 2015) (finding that the prosecutor's comments during closing argument did

not substantially affect the petitioner's right to a fair trial when the comments were summarizing

the evidence and responding to the defense's arguments), *R&R adopted by*, 2015 WL 13912105

(S.D. Tex. Sept. 5, 2015).

Chatman also objects to the prosecutor's improper comments that Chatman "pimps"

minors" and is the "queen of Backpage," because these comments made it sounds like she "is a

child molester." (Docket Entry No. 1 at 7; Docket Entry No. 2 at 9). The court has reviewed the

trial transcript. It appears that Chatman objects to the following portion of the State's closing

argument during the punishment phase of trial:

> [Chatman] still thinks that she's the victim here. You heard that from her when she
> took the witness stand here in punishment. She still thinks she's the victim. And
> we know that this is what she does. Everything is everybody else's fault but mine.
> Every judgment that we put in here throughout this trial, she says: "Oh, yeah. Yeah,
> that was me; but I didn't really do it." She gets convicted of promoting prostitution,
> but that wasn't really her. But you've seen her Facebook page, you know that she
> solicits sex, you know that she puts children in her calendar, pimps them out, too.
> We don't know what else she does. Does she sell narcotics? That's what one of
> the Facebook posts implies. We don't know what she's doing.

(Docket Entry No. 17-17 at 108–09).

During the defense's case-in-chief, Chatman testified that she made calendars featuring

girls in bikinis and sold them as a business venture:

> Q.    I'm going to show you D2. And you said this is a calendar. Let's explain
>       this to the jury. What's this all about?
>
> A.    In – that's XplicitchiX calendar, and I'm Xplicit. That's the name that I use
>       whenever I'm doing my music. And in this calendar I'm surrounded by my
>       calendar girls in, I think, 2007.
>
> Q.    I'm going to shift it a little bit so they can see it as well. And what do you
>       do, what is it that you do?
>
> A.    Basically I do music. So women -- I especially like men, but I've always
>       been overweight. I had lost a lot of weight before I went to jail, but I gained
>       80 pounds in jail. But before this is my size, and then I lost a lot of weight.
>       But I used to use the women in the bikinis to help sell my CDs. You know,
>       it costs like $2 per calendar to print up pictures and everything, get 1,000

> calendars, and then you can sell those calendars for $10, and so you make
> good money.  It's a pretty good profit in that.

(Docket Entry No. 17-15 at 159–60).  The calendar was admitted into evidence.  (*See* Docket Entry

No. 17-20 at 25).  The photo features Chatman in the center surrounded by several young women

in bikinis.  (*See id.*).

During cross-examination, the State questioned Chatman further about her business in the

entertainment industry and her pseudonym of "Xplicit":

Q.     But, ma'am, your entertainment name is Xplicit.  Correct?

A.     Yes.

Q.     As in X rated?

A.     Xplicit as in Xplicit, like, yeah.

Q.     As in not suitable for children?

A.     Yeah.  I mean, somebody else named me.  I like the name a lot.

Q.     And you actually use Xs just like as in X-rated?

A.     I'm an adult.

Q.     And you post a lot of that X-rated content on your Facebook page.  Correct?

A.     I have a real Facebook page in my real name.

Q.     And that also says Xplicitchix on it?

A.     Yes.  It also has only women in my pictures.

Q.     And you actually ask men to contact you in some of those Xplicit Facebook
       posts that you make?

A.     I have.  When I got out of jail I lost everything.

Q.     Okay.  You actually ask men to contact you in order to talk about sexual
       things?

A.      I used to be a phone sex operator in 2001 whenever there was no -- we went
through World Trade Center, tiling is down, I worked at TDC, and I did
phone sex operation.  I could call and talk to different -- people could call
me.  I'm really good at lyrics, and I talk real good.

Q.      So, ma'am, you're talking about 2001.  I'm talking about 2013 you were
posting comments requesting men to contact you for sexual acts?

A.      Single black female, no plans, no man.  Yeah, I charge for my time.

(Docket Entry No. 17-16 at 71–72).  The prosecutor's questioning Chatman of whether she ever

solicited men for sex on Facebook lead to Chatman admitting that she had previously pleaded

guilty to promoting prostitution:

Q.      Okay.  So you haven't been soliciting men for sex since 2013?

A.      I have never in my life sold my body for money, ma'am.

Q.      You've never been convicted of promoting prostitution?

A.      I pled out to promoting prostitution, but really and truly it was a different
situation where the guy called me in -- I do ads, I do sexy body rubs.  I just
started doing this because I actually met a prostitute in Montgomery County
jail.  And I spent six months in solitary confinement.  And she was just
telling me that BBW is in now.  I was like: "I can't sell my body.  I don't
know how you could do it."  And, you know, we just got to talking.  And
she was like: "You don't even have to sleep with them."  Long story short,
I was able to start a business.  I was able to start a business where I can go
to your house and not have to sleep with you.  I'm doing a good job.  You'll
never find another prostitute that could –

. . .

Q.      And that's actually what this shows.  This is the Information in that case.
And it says that, while acting other than a prostitute, you received
compensation for personally rendered prostitution services, knowingly
soliciting W Jones to engage in sexual conduct, namely sexual intercourse,
straight sex with another person for compensation and then just below that
it's the same language except for it's deviant sexual intercourse, oral sex.
So that's what you were convicted of.  Correct?

A.      I never read this before, but I was never convicted.  I pled out after going to
court for 11 different months straight.

Q.      You just said you were never convicted, but this judgment shows that you were.  Correct?

A.      I pled out.  Is that a conviction?  I wasn't, like, taken to trial.

Q.      Right here it says offense for which defendant convicted.  Correct?

A.      Okay.  I pled out.  If you notice, I was arrested January.  And then they kept calling me to court every month.  Reset, reset, reset.  So he offered me a time served, and I just took the time served.

Q.      And you had the opportunity for a trial in this case, too, but you chose to plead guilty?

A.      I had better -- I owned my own business.  I couldn't just keep taking off to go downtown Houston every single month, so I pled out for time served.

Q.      Okay.  And, in fact, as recently as February 21st of this year you called yourself the queen of Backpage?

A.      No.  It was a story about how I was the queen of Backpage.  But if you want to read that then you know good and well I never had sex on Backpage.

Q.      Backpage is a site that is used for sexual trafficking.  Correct?

A.      It's also used to sell other things.  It's used for a lot of different things; but, yeah, you can sex traffic on that site.

Q.      And it's also used for people selling sexual services in general?

A.      It is part of the service.

(*Id.* at 78–80).

Based on the testimony adduced at trial, the prosecutor's statements during closing argument of the punishment phase of trial (reproduced above) were a proper summarization of the evidence.  Chatman has not shown that the prosecutor's comments so infected the trial with unfairness as to make the punishment she received a denial of due process.

Chatman does not demonstrate that relief is warranted under the governing federal habeas corpus standard of review and the respondent is entitled to dismissal of this claim.

    2.    *The claim that the prosecutor knowingly introduced false evidence and false testimony*

Construing Chatman's pleadings liberally, she appears to argue that the prosecutor knowingly allowed false testimony and a "false witness" by allowing Officer Elmore to testify. (*See* Docket Entry No. 2 at 8–9).

"[A] conviction obtained through false evidence, known to be such by representatives of the State[,] violates a defendant's constitutional rights." *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (citing *Miller v. Pate*, 386 U.S. 1, 7 (1967) (internal quotation marks omitted). As explained by the Fifth Circuit:

> A violation occurs where there is a deliberate deception of court and jury by the presentation of testimony known to be perjured.  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.  To obtain relief, [a petitioner] must show 1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material.  The testimony is material if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

*Id.* (internal citations and quotation marks omitted).

During the state habeas proceeding, the state district court judge rejected Chatman's claims that Officer Elmore testified falsely:

<u>FINDINGS OF FACT</u>

. . .

30.  A former police officer who pursued the applicant's vehicle and testified at her trial, Kenneth Elmore, was subsequently convicted of two counts of tampering with a governmental record by making false entries in an incident report and arrest record in Cause Nos. 18-06-08359 and 18-06-08363 in the 221st District Court, Montgomery County, Texas.

31.  Elmore's testimony in the applicant's trial was corroborated by the testimony of the applicant and another police officer and by video recordings of the offense, and there is no credible evidence that Elmore testified falsely about any material fact during the applicant's trial.

<u>CONCLUSIONS OF LAW</u>

. . .

10.  The applicant has not shown by a preponderance of the evidence that material, false testimony was introduced against her during trial.  *See Ex parte Weinstein*, 421 S.W.3d 656, 664–66 (Tex. Crim. App. 2014).

(Docket Entry No. 17-35 at 226–28).

Chatman has not met her burden to show that Officer Elmore's testimony was actually false or that the State knew it was false.  To the contrary, as discussed in Part III.A.2.d, Elmore's testimony at trial was supported by other evidence at trial, including video and audio recordings, the testimony of Officer Reeves, and Chatman's own testimony.  Chatman has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or was otherwise based on an incorrect determination of the facts.  Because Chatman does not demonstrate that she is entitled to relief on this claim, the respondent is entitled to dismissal of this claim.

3.      *The claim that the prosecutor failed to disclose exculpatory evidence*

Chatman alleges that the prosecutor "withheld the arrest of Officers Kenneth Elmore and John McCaffery of the Willis Police Department."  (Docket Entry No. 2 at 9).  Chatman argues that the arrest of the police officers was relevant to her defense of police corruption.  (*See id.*).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that the government violates due process when it fails to disclose evidence favorable to the accused if such evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  The government's duty to disclose extends to both impeachment and exculpatory evidence.  *See United States v. Bagley*, 473 U.S., 676 (1985).  To prove a *Brady*

claim, a petitioner "must show three things: (1) the evidence at issue is favorable to the defense, either because it is exculpatory or impeaching, (2) the prosecution suppressed the evidence, and (3) the evidence is material." *Murphy*, 901 F.3d at 597. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "Evidence is material where there exists a 'reasonable probability' that had it been disclosed the result of the trial would have been different." *Dickson v. Quarterman*, 462 F.3d 470, 477 (5th Cir. 2006). "Under AEDPA, [a federal habeas court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a *Brady* violation." *Id.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)). "Rather, [the federal habeas court] decide[s] whether the state court's *Brady* determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law." *Id.* (citing *Busby*, 359 F.3d at 717).

In the state habeas proceeding, the state district court found that Chatman "has not shown by a preponderance of the evidence that material, false testimony was introduced against her during trial. *See Ex parte Weinstein*, 421 S.W.3d 656, 664–66 (Tex. Crim. App. 2014)." (Docket Entry No. 17-35 at 228). The court also found that "Elmore's testimony in the applicant's trial was corroborated by the testimony of the applicant and another police officer and by video recordings of the offense, and there is no credible evidence that Elmore testified falsely about any material fact during the applicant's trial." (*Id.* at 226–27). These factual findings are presumed correct unless Chatman presents clear and convincing evidence to the contrary. The Texas Court of Criminal Appeals expressly relied on these findings of fact, as well as its own independent review of the record, in denying habeas relief.

Chatman has failed to overcome the presumption of correctness that applies to the state court's factual findings.  She offers no evidence that the prosecution suppressed the evidence or that the evidence was material.  Even if the court assumes that the defense could have effectively impeached Officer Elmore with evidence of his arrest, there was other probative evidence, as noted by the state habeas court, of Chatman evading arrest with a motor vehicle, including video and audio recordings of Chatman refusing to get out of her vehicle and the ensuing chase with police, testimony from the police officer who initially pulled Chatman over, and Chatman's own testimony.  (*See, e.g.*, Docket Entry No. 17-15 at 11–25, 38–51, 108–120; Docket Entry No. 17-16 at 35).   The state court could reasonably conclude that this other evidence presented at trial made the undisclosed impeachment evidence immaterial "because confidence in the outcome was not undermined."  *Dickson*, 462 F.3d at 478 (citing *Kopycinski v. Scott*, 64 F.3d 223, 226 (5th Cir. 1995) and *Edmond v. Collins*, 8 F.3d 290, 294 (5th Cir. 1993)); *see also United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989) ("Courts have found . . . that impeachment evidence improperly withheld was not material where the testimony of the witness who might have been impeached was strongly corroborated by additional evidence supporting a guilty verdict.").

The record fails to show that the state habeas court's denial of Chatman's *Brady* claim was an unreasonable or contrary application of clearly established federal law, or that the state habeas court's decision involved an unreasonable determination of the facts based on the evidence in the record.  No basis for habeas relief is shown, and the respondent is entitled to dismissal of this claim.

## IV.      Certificate of Appealability

Chatman has not requested a certificate of appealability, but Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner.  *See* 28 U.S.C. § 2253.  A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To warrant a certificate of appealability as to claims denied on their merits, the petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack*, 529 U.S. at 484).  When relief is denied based on procedural grounds, a petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that jurists of reason "would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.  A district court may deny a certificate of appealability on its own, without requiring further briefing or argument.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

After carefully considering the record, the court concludes that Chatman has not met the requisite showing.  There are no grounds to issue a certificate of appealability.

## V.      Conclusion

Chatman's petition for a writ of habeas corpus, Docket Entry No. 1, is dismissed with prejudice.  Any pending motions are denied as moot.  A certificate of appealability will not issue.  Final judgment is separately entered.

SIGNED on June 5, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge